# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONWIDE AIRLINES (PTY) LTD., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | No. 3:04 CV 00768 (MRK) |
| | : | |
| | : | |
| AFRICAN GLOBAL, LTD., NEIL | : | |
| ATKINSON d/b/a AFRICAN GLOBAL, | : | |
| LTD., ATKINSON ASSOCIATES, INC., | : | |
| d/b/a AFRICAN GLOBAL, LTD., NEIL | : | |
| ATKINSON, Individually, and | : | |
| ANNETTE ATKINSON, Individually, | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM OF DECISION</u>

This is a diversity action arising out of an agreement to sell tickets in North America for

Nationwide Airlines (PTY) Ltd. ("Nationwide"), a South African airline. The case involves claims

and counterclaims for breach of contract and a variety of torts. Nationwide asserts that the

Defendants breached a general sales agreement with Nationwide by improperly withholding, to this

day, funds that are admittedly owed Nationwide for ticket sales. Nationwide also includes counts

for conversion and statutory theft relating to the same funds. The Defendants counterclaim for

breach of contract, asserting that Nationwide improperly terminated the general sales agreement

without the notice and opportunity to cure provided for in the agreement. Defendants also claim that

Nationwide tortiously interfered with their business relations in connection with that termination.

The parties tried the case to the Court over a three-day period. The trial included both live

testimony and testimony via deposition. The parties also submitted a stipulation of facts and pre-trial

and post-trial briefs.  In accordance with Rule 52 of the *Federal Rules of Civil Procedure*, the Court makes the following findings of fact and conclusions of law.

I.

The summary that follows, which is based upon the parties' stipulation of facts and the facts presented at trial, is intended to provide general background.  Further facts bearing on the contested issues are discussed in later sections.

**The Parties.**   Nationwide, a South African corporation, is a commercial air carrier based in South Africa.  Vernon Bricknell is Nationwide's CEO.

Neil Atkinson has worked in the travel industry, with a focus on Africa, for decades.  In the past, he has served as a general sales agent in North America for Air Seychelles, Air Mauritshuis, and Zambian Express Airways, and he has performed consulting work on airline issues in Zambia and the Congo.  Mr. Atkinson formed a corporation called Atkinson Associates, Inc. in 1990, and he is currently the sole owner of that corporation.   Atkinson Associates is the corporation that both Mr. Atkinson and Mrs. Atkinson have used to carry on their work in the airline industry and in  the physical therapy field, respectively.  In the past, Mr. Atkinson has conducted business in the airlines industry under the trade names of "African Global" or "African Safari Trails."

**The GSA Agreement.**     In or about 2001, Christopher Hoare, Nationwide's then-director of marketing, contacted Mr. Atkinson after seeing a business plan Mr. Atkinson had prepared for Zambian Airlines.  Nationwide had recently been awarded routes between Johannesburg, South Africa, and  Livingston, Zambia, and Mr. Hoare contacted Mr. Atkinson to see if he was interested in representing Nationwide in North America.  Nationwide did not previously have a sales agent or organization in North America.  Mr. Hoare flew to Ft. Lauderdale, Florida in February 2001 and met

2

with Mr. Atkinson to discuss the representation. At all times material to this case, tour operators were the exclusive market for Nationwide in North America.

After negotiating the terms of the agreement in Florida, Mr. Hoare returned to South Africa and received approval to appoint Mr. Atkinson as Nationwide's general sales agent ("GSA") in or about March 2001. For most of the times relevant to this dispute, Mr. Atkinson's principal contact at Nationwide was Mr. Hoare.

On or about June 19, 2001, Mr. Atkinson signed an agreement, prepared by Mr. Hoare, entitled "GSA Agreement: Nationwide Airlines and African Global" ("GSA Agreement"). Joint Ex. 8. The GSA Agreement went into effect in May 2001. The parties dispute whether Mr. Atkinson signed the GSA Agreement in his individual capacity or in his capacity as an officer of Atkinson Associates, Inc. d/b/a African Global, Ltd., and whether the subsequent business activities conducted in connection with the GSA Agreement were conducted by Mr. Atkinson in his individual capacity or by Atkinson Associates, Inc. d/b/a African Global, Ltd. ("African Global"). The GSA Agreement recites that it is between Nationwide and "AFRICAN GLOBAL, Ltd., a North American corporation . . . having its principal place of business at 100 Ralsey Road, Stamford, Connecticut." Mr. Atkinson signed the GSA Agreement as "President" of "African Global." Moreover, Mr. Atkinson used the email address "africanglobal@worldnet.att.net" throughout the period the GSA Agreement was in effect and did not use the name Atkinson Associates in any email messages with Nationwide.

The complication, however, is that African Global Ltd never existed as a North American corporation. "African Global" is merely a trade name used by Mr. Atkinson and Atkinson Associates, Inc., which has its principal place of business at Mr. Atkinson's home on Ralsey Road

in Stamford.  In addition, Mr. Atkinson acknowledged that he never registered African Global as a

trade name for himself or Atkinson Associates.  Moreover, he testified that he never informed Mr.

Hoare or anyone else at Nationwide that African Global was a trade name only, that his corporation

was actually called Atkinson Associates, Inc., or that he was the president of Atkinson Associates,

Inc., not African Global.   To complicate matters even further, at the time Mr. Atkinson signed the

GSA Agreement in 2001, Atkinson Associates had been long since dissolved by the Connecticut

Secretary of the State because of the failure of the company's accountant to file annual reports.  *See*

Joint Ex. 6.  It was not until after this litigation was commenced that Mr. Atkinson and his lawyers

discovered that the Secretary of the State had dissolved Atkinson Associates on or about October 1,

1993.  Thereafter, on January 10, 2005,  Mr. Atkinson filed a Certificate of Reinstatement for

Atkinson Associates with the Connecticut Secretary of the State, which was accepted.  *See* Joint Ex.

7.  The effect, if any, of that reinstatement is a disputed issue in this case.  For the reasons explained

below in Subsection II.A.1, the Court will refer to the  general sales agent appointed under the GSA

Agreement as "Atkinson Associates."

The GSA Agreement appointed Atkinson Associates to serve as Nationwide's general sales

agent to market and sell passenger travel services in North America and Canada.  A number of the

GSA Agreement's provisions are at issue in this case and will be discussed in greater detail below.

Among Atkinson Associates's duties delineated in the GSA Agreement was the obligation to

> collect payments for all transportation sold in the territory by GSA, and its
> subcontractors and subagents, on Nationwide ticket stock.  GSA shall pay such
> amounts to Nationwide airlines in accordance with Article IV of this agreement.
> GSA shall keep complete records and sales documentation and shall account to
> Nationwide Airlines for all transactions.

Joint Ex. 8, Art. II, para. J.  Article IV states:

> All amounts collected by GSA for transportation sold on behalf of Nationwide Airlines under this agreement, *including any remuneration which GSA is entitled to claim hereunder*, are the property of Nationwide Airlines and shall be held by GSA in trust for Nationwide Airlines on behalf of Nationwide Airlines until satisfactory accounted for and full settlement has been made.

*Id.*, Art. IV, para. G (emphasis added). Article IV gave Nationwide the right to issue debit or credit memos and states that in the event of a dispute regarding the cause of debit or credit memos, "absent manifest error, Nationwide Airlines' decision . . . shall be final." *Id.*, Art. IV, para. H. Article V provides that all Nationwide passenger documentation, including all ticket stock, "shall remain the property of Nationwide Airlines." *Id.*, Art. V., para A. Paragraph D states that "Nationwide Airlines shall be entitled to withhold any and all payments otherwise owed GSA until any actual payment shortages are satisfied." *Id.*, Art. V, para. D.

The initial term of the GSA Agreement was for three years, until May 1, 2004. The agreement would then be renewed automatically for an additional year, unless either party provided ninety days' notice of termination. However, Mr. Atkinson negotiated for a provision that stated that "[f]ollowing the initial term of the Agreement, first option to renew will be offered [Atkinson Associates] for an additional 3 year period." *Id.*, Ex. F. The GSA Agreement also gave either party the right to terminate the agreement upon thirty days' advance written notice in the event of a material breach of any provision of the agreement, "it being understood and agreed that the failure to pay any monies when due shall constitute a material breach." *Id.*, Art. VIII, para. A.1. The GSA Agreement included a provision stating that it constituted the "entire agreement between the parties hereto concerning the subject matter hereof," and that "[n]o modification to this agreement shall be effective unless it is in writing and signed by the party sought to be charged with such modification." *Id.*, Art. X, paras. B, C.

An exhibit to the GSA Agreement set forth the compensation terms. It gave Atkinson Associates a sales commission of 11% on all sales made directly on Nationwide traffic documents and 4% on routings issued on other airline ticket stock. Atkinson Associates could also generate profits for itself by selling tickets on a "net fare" basis; that is, Atkinson Associates would purchase the tickets from Nationwide at a net fare and then resell the tickets for an amount above the net fare, pocketing the difference. In practice, nearly all of Atkinson Associates's sales were done on a net fare basis, rather than on commission. The exhibit also provided that Nationwide would pay Atkinson Associates a monthly retainer of $2,000 and a monthly contribution to expenses of $500. Added to the exhibit was this handwritten clause: "Additional expenses to be pre-approved, including business travel expenses." *Id.*, Ex. E. The parties have stipulated that Mr. Hoare had authority to approve or disapprove expenses incurred by Atkinson Associates, in accordance with the GSA Agreement. Mr. Hoare also had authority to alter or modify the net fares that Atkinson Associates was charged for Nationwide Airlines tickets, in accordance with the GSA Agreement.

**Performance Under the GSA Agreement.** At all times relevant to the case, neither Mr. Atkinson nor Atkinson Associates represented any airline other than Nationwide. Nor did he or his company conduct any airline-related business other than representing Nationwide under the GSA Agreement. Sales of Nationwide tickets were small in 2001–gross sales were only $9,177.56. However, as a result of Mr. Atkinson's efforts, sales grew nicely in later years–in 2002, gross revenue was $156,886.07 and then $769,180.03 in 2003. In accordance with the terms of the GSA Agreement and with the knowledge and consent of Mr. Hoare, Atkinson Associates appointed "Value Holidays" (United States), "Metropolis Mayoristas En Viajes Y Rep. Tur. S.A. De C.V." (Mexico), "Lion World Travel" (Canada), and "South Reps" (Brazil) as sub-agents under the GSA

Agreement. These sub-agents provided Mr. Atkinson with periodic reports and remittances of money with respect to the Nationwide ticket sales they made in their respective territories.

Ken Spitz of Value Holidays, a Wisconsin corporation, and Mr. Atkinson worked out the details of Value Holidays's sub-agency in or about July 2002. Mr. Atkinson had never before done business with Value Holidays, which had approached Mr. Atkinson about working on Nationwide ticket sales. Joint Exhibit 9 is an email Mr. Atkinson sent to Mr. Spitz outlining terms, "subject to further discussion," between an entity referred to as "Nationwide Airlines USA" in Stamford, CT and Value Holidays. The email does not refer to African Global or Atkinson Associates. The email states that Value Holidays "may trade as Nationwide Airlines, for the purposes of operating a North American on-line reservations and ticketing office" and shall be referred to as "Nationwide, Mid West." Mr. Atkinson ends the email with the following: "Ken, if this draft proposal is of interest to you, please let me know and I will discuss the execution phase with you and draw up a memorandum of understanding." Joint Ex. 9. A written agreement was drafted but never signed by the parties.

Neither Mr. Atkinson nor Atkinson Associates had any other relationship with Value Holidays besides the Nationwide sub-agency. Beginning in approximately July 2002 and thereafter, Value Holidays traded and held itself out as Nationwide Airlines. Value Holidays assigned its employee Ronnie Harris to perform Value Holidays's functions on the Nationwide account. During all relevant times, Value Holidays performed all reservation and ticketing functions for Nationwide tickets sold in the United States. According to Mr. Atkinson, Value Holidays was the "back office" operations of Nationwide in the United States. A phone call to Nationwide's office in the United States would connect directly to Value Holidays's office in Wisconsin. Mr. Atkinson sold Nationwide tickets to Value Holiday at a mark up from the net fare that Atkinson Associates had

received from Nationwide; Value Holidays in turn would then sell the tickets to African tour operators at a further mark up determined by Mr. Atkinson. According to Mr. Atkinson, Mr. Hoare of Nationwide agreed to pay Value Holidays a $1200 month retainer for its ticket and reservation services, in addition to the $2000 a month retainer that Nationwide had agreed to pay Atkinson Associates.

During the period August 15, 2002 through January 28, 2004, Atkinson Associates received the following monthly reports and remittances from Value Holidays:

| Report Period | Remittance |
|---|---|
| August 15 – September 22, 2002 | $ 12,109.56 |
| October 2002 | $ 47,095.66 |
| October 22 – November 22, 2002 | $ 29,013.90 |
| November 22 – December 22, 2002 | $ 10,429.47 |
| December 23, 2002 – January 22, 2003 | $ 21,123.93 |
| January 23 – February 22, 2003 | $ 61,513.71 |
| February 23 – March 22, 2003 | $ 36,184.51 |
| March 23 – April 22, 2003 | $108,686.19 |
| April 23 – May 22, 2003 | $ 55,040.48 |
| May 23 – June 30, 2003 | $ 85,479.59 |
| July 1 – 15, 2003 | $ 37,232.13 |
| July 15 – 31, 2003 | $ 20,621.47 |
| August 1 – 15, 2003 | $ 70,862.27 |
| August 15 – 31, 2003 | $ 27,385.75 |
| September 1 – 15, 2003 | $ 42,011.80 |
| September 15 – 30, 2003 | $ 33,563.14 |
| October 1 – 15, 2003 | $ 46,661.64 |
| October 16 – 31, 2003 | $ 30,817.83 |
| November 1 – 15, 2003 | $ 26,410.91 |
| November 16 – 30, 2003 | $ 25,190.43 |
| December 1 – 15, 2003 | $ 29,453.22 |
| December 16 – 31, 2003 | $ 22,133.53 |
| January 1 – 15, 2004 | $ 42,790.37 |
| **Total for the Period** | **$921,731.49** |

Joint Trial Memorandum [doc. # 55] at 12-13. Sales by the other sub-agents were significantly less. Sales by Metropolis totaled only $10,363.91; sales by Lion World Travel totaled only $10,101.11; and sales by South Reps totaled only $7,688.00.

In connection with the sale of tickets under the GSA Agreement, Atkinson Associates was required to prepare monthly Ticket Sales Reports ("TSRs"), which provided the details concerning Nationwide tickets sold during the period. The TSRs Atkinson Associates provided Nationwide incorporated information provided to Atkinson Associates from the sub-agents. Particularly in early 2003, Atkinson Associates's TSRs were quite late in getting to Nationwide, and by April 2003, Nationwide's auditors were raising questions about the accuracy and timeliness of Atkinson Associates's reporting. Mr. Atkinson testified that the delay in reporting resulted from Nationwide not allowing him to send the TSRs by overnight delivery and the fact that the postal service in South Africa was poor. The Court need not resolve this factual dispute. It is undisputed, however, that no TSR was ever submitted for January 2004.

All of the financial transactions conducted by Atkinson Associates in connection with ticket sales under the GSA Agreement were handled through Chase Bank Checking Account No. 821-50006306-85, and Business Money Market Account No. 391-1109621-65, maintained in the name of "Atkinson Associates Inc. d/b/a Nationwide Airlines–Africa" (the "Chase Bank Accounts"). *See* Joint Ex. 22 (Chase bank statements). Mr. Atkinson testified that he opened the Chase Bank Accounts for the purpose of conducting business under the GSA Agreement and holding the money earned on the Nationwide ticket sales. He also testified that the Chase Bank Account included his profit margin on Nationwide ticket sales and that, from time to time, he would write checks to himself on the Chase Bank Accounts to cover expenses. During the relevant period, Mr. Atkinson

wrote checks totaling $28,500 to himself on the Chase Bank Accounts.  *See* Pl.'s Ex. 257.  Thus, according to Mr. Atkinson, the Chase Bank Accounts held both Nationwide's money and his own; as he put it, he "commingled" his own profits with Nationwide's funds in the Chase Bank Accounts, though he never told Nationwide that fact or obtained their consent to do so.

Furthermore, even though the GSA Agreement required Atkinson Associates to remit funds monthly to Nationwide, according to Messrs. Atkinson and Hoare, Mr. Atkinson was told by Peter Griffiths, Nationwide's chief financial officer, not to remit funds to Nationwide for tickets sold on a monthly basis, but rather to accumulate funds in the United States and then to remit them to South Africa only when requested.  Nationwide disputes that it ever authorized Mr. Atkinson to accumulate Nationwide's funds in the United States, and during his testimony, Mr. Atkinson admitted that he first started to withhold money as a "cushion" in late 2002 and early 2003 before either Mr. Hoare or Mr. Griffiths had supposedly agreed to allow him to accumulate funds in the United States.

In any event, the parties have stipulated that the net amount due to Nationwide for the Nationwide tickets sold under the GSA Agreement during the relevant time period, not including any adjustments for fees, expenses, or other items that might be applicable to those sales under the GSA Agreement, was $938,821.82, calculated  as follows:

| Report Period | | Net Amount |
|---|---|---|
| May 2001 | - | $  4,997.76 |
| June and July 2001 | - | $  2,857.80 |
| August 2001 | - | $  1,512.00 |
| September 2001 | - | $     897.60 |
| October 2001 | - | $  1,031.48 |
| November 2001 | - | $     277.92 |
| December 2001 | - | $     460.80 |
| January 2002 | - | $  4,058.88 |
| February 2002 | - | $  5,392.99 |

| | | |
|---|---|---|
| March 2002 | - | $  1,930.56 |
| April 2002 | - | $  6,084.80 |
| May 2002 | - | $  7,022.57 |
| June 2002 | - | $ 15,561.87 |
| July 2002 | - | $  9,980.74 |
| August 2002 | - | $ 10,287.01 |
| September 2002 | - | $ 18,882.10 |
| October 2002 | - | $ 42,510.30 |
| November 2002 | - | $ 25,245.00 |
| December 2002 | - | $ 10,650.21 |
| January 2003 | - | $ 19,809.72 |
| February 2003 | - | $ 55,110.16 |
| March 2003 | - | $ 31,898.66 |
| April 2003 | - | $ 97,231.89 |
| May 2003 | - | $ 52,672.76 |
| June 2003 | - | $ 80,552.90 |
| July 2003 | - | $ 83,804.87 |
| August 2003 | - | $ 92,066.33 |
| September 2003 | - | $ 75,018.88 |
| October 2003 | - | $ 68,897.68 |
| November 2003 | - | $ 46,237.50 |
| December 2003 | - | $ 65,878.68 |
| | | |
| **Total for Period** | | **$938,821.82** |

Joint Trial Mem. [doc. # 55] at 15-16.

   The parties have also stipulated that, from the inception of the GSA Agreement, Atkinson

Associates remitted a total of only $563,338.08 to Nationwide. These remittances were made via six

wire transfers on the following dates and in the following amounts:

| Report Period | | Remittance Amount |
|---|---|---|
| November 14, 2002 | - | $  30,000.00 |
| January 29, 2003 | - | $  63,712.60 |
| April 28, 2003 | - | $  21,130.85 |
| August 5, 2003 | - | $211,919.00 |
| October 23, 2003 | - | $150,330.73 |
| January 26, 2004 | - | $  86,244.90 |
| | | |
| **Total for Period** | | **$563,338.08**. |

Joint Trial Mem. [doc. # 55] at 17.

Whether Mr. Atkinson was authorized to accumulate Nationwide funds or not, it is undisputed that on July 23, 2003, Mr. Griffiths sent an email to Mr. Atkinson in which Mr. Griffiths said, "[u]nfortunately, we have still not received any proper reconciliations from you and I am obviously now extremely concerned."  Pl.'s Ex. 240.  Mr. Griffiths went on to state that, based on the TSRs, gross sales amounted to about $400,000, and "I would therefore ask that you immediately transfer US $350,000 into our account" in South Africa.  *Id.*  Mr. Griffiths stated that he wanted to receive the payment by the end of the week.  On August 5, 2003, Mr. Atkinson wired $211,919 to Nationwide.  However, he acknowledged in his testimony that as of August 2003, Atkinson Associates owed Nationwide more than $211,919 and that the company had at least an additional $100,000 in the Chase Bank Accounts that belonged to Nationwide and that he did not remit to Nationwide in response to Mr. Griffiths' request..

**Events in January-April 2004.**   In January, Mr. Atkinson's relationship with Nationwide unraveled.  On January 13, 2004, Atkinson Associates provided Nationwide with its December 2003 report, which showed a net amount due for the month of $65,878.68.  On January 15, 2004, Value Holidays sent Atkinson Associates a mid-month report showing ticket sales for the first half of the month, and a check for $42,790.37 covering those ticket sales.  Mr. Atkinson deposited the Value Holidays check in the Chase Bank Accounts on January 24, 2004.

On Monday, January 26, Nationwide suspended Mr. Hoare from his position as marketing director and later terminated him.  Mr. Hoare sent Mr. Atkinson an email on the morning of January

26 to inform him of the suspension.[1]  On the same day, Mr. Griffiths spoke with Mr. Atkinson and directed him to immediately send Nationwide all the money owed to Nationwide under the GSA Agreement and to provide Nationwide with a reconciliation.  Mr. Griffiths testified that he was concerned that Mr. Atkinson was withholding a substantial amount of money from Nationwide that it was owed under the GSA Agreement.  At the time of the call, Mr. Griffiths estimated that Mr. Atkinson owed Nationwide over $300,000.

Mr. Atkinson admitted that he did not comply with either of Mr. Griffiths's January 26 directives.  Instead, he told Mr. Griffiths that his computer had crashed and that, as a result, he could not reconcile the full amount due.  Nonetheless, and in an apparent effort to placate Mr. Griffiths, Mr. Atkinson immediately wired $86,000 to Nationwide.  Mr. Atkinson acknowledged at trial that he knew at the time of the wire transfer that Atkinson Associates owed Nationwide far more than $86,000 and also that there was far more than $86,000 in the Chase Bank Accounts at that time.  In fact, there appears to have been over $422,000 in the Chase Bank Accounts at the time of the $86,000 wire transfer.

On January 29, 2004, Mr. Atkinson–obviously concerned about Mr. Hoare's suspension and Mr. Griffiths's demands–transferred, via wire transfer, $300,000, from Chase Bank Checking Account No. 821-50006306-85 into an account at Citibank maintained in the name of Atkinson Associates Inc. d/b/a African Global African Safari Trails, Checking Account No. 0047651601

---

[1] At or around this same time frame, Mr. Bricknell called Mr. Atkinson in the middle of the night to complain about certain Nationwide flights to Kilimanjaro, an issue that in this litigation has come to be called the "JRO Hard Block" issue.  The Court discusses that issue later in this opinion. For present purposes, it suffices to say that Mr. Atkinson recalls Mr. Bricknell accusing Messrs. Atkinson and Hoare of being involved in a ticketing scam relating to these flights.  Several days later, Mr. Bricknell called Mr. Atkinson again and this time demanded payment of all monies Atkinson Associates owed to Nationwide.

("Citibank Checking Account"). *See* Joint Ex. 23. Nationwide was not aware of this transfer and did not consent to it. Later, on February 2, 2004, Mr. Atkinson transferred the $300,000 from the Citibank Checking Account into a related Citibank Business Individual Money Market Account, Account No. 47651089, which also was maintained under the name Atkinson Associates Inc. d/b/a African Global African Safari Trails. Mr. Atkinson testified at trial that the purpose of making the transfer from the Chase Bank Accounts to the Citibank accounts was because he was concerned that Nationwide would attach the funds in the Chase Bank Accounts; because of the wire transfers, Nationwide was aware of the Chase Bank Accounts but unaware of the existence of the Citibank accounts. As Mr. Atkinson candidly acknowledged, part of his thinking was to put the $300,000 out of the reach of Nationwide. He also said that, if he had left it all in the Chase Bank Accounts, Nationwide would "feel it was all their funds."[2] After transferring the $300,000 to the Citibank account, Mr. Atkinson still had about $122,000 remaining in the Chase Bank Accounts. Today, there is only about $1,000 in the Chase Back Accounts; nearly all of the approximately $120,000 that was left in those accounts has been spent by Mr. Atkinson on legal fees in this litigation.

By a letter dated February 1, 2004, Mr. Atkinson informed Mr. Griffiths that "I anticipate that the January TSR should be completed by February 8-10th at which time we will remit the balance, which I estimate should be about $60,000." Joint Ex. 10; *see* Defendants' Ex. 505. In fact, at the time, there was over $400,000 in the Atkinson Associates accounts, and Mr. Atkinson knew that Nationwide was owed far more than $60,000. So did Mr. Griffiths. On the stand, Mr. Atkinson

---

[2] Mr. Atkinson gave a variety of versions for why he moved the money out of the Chase Bank Accounts. At his deposition, Mr. Atkinson testified that he had decided to pay himself $300,000, $100,000 for each year of the GSA Agreement. Later in the same deposition, he said that he also wanted leverage in negotiations with Nationwide.

testified that he withheld the money from Nationwide in order to retain leverage over Nationwide to obtain a settlement of its claims against him.  When asked by the Court: "If you had more of their money, they would be willing to give up on litigation sooner?," Mr. Atkinson responded, "Exactly, sir."

On Monday, February 2, 2004, Mr. Griffiths spoke with Ronnie Harris of Value Holidays. He had never met or spoken with Ms. Harris before but was told to call her by Vernon Bricknell, who had discovered Ms. Harris's existence when he called the U.S. telephone number for Nationwide and Ms. Harris answered the telephone.  *See* Defs.' Ex. 526.  Mr. Griffiths told Ms. Harris that Nationwide was concerned that it was not receiving from Mr. Atkinson all of the money generated from sales of Nationwide tickets and that Value Holidays should direct all future remittances for sales of Nationwide tickets directly to Nationwide and not to Mr. Atkinson, until further notice.  Mr. Griffiths then confirmed his instructions to Ms. Harris in an email on February 2, 2004.  Joint Ex. 11.  The email states,

> I requested that you do not make any further payments to African Global until such time as their remittances to us are normalized.  We will shortly be sending a fax to Neil concerning the Nationwide/African Global GSA Agreement, and we will copy you on it.  As I also mentioned, you should continue to operate normally with the exception of payments to African Global.

*Id.*  According to Mr. Griffiths, Nationwide had not yet decided to terminate Atkinson Associates but merely wanted to make sure that it did not lose any further money.

By letter dated February 3, 2004, Nationwide's law firm wrote to Mr. Atkinson as follows:

> Our client has repeatedly requested you to provide sales returns and reconciliations in an acceptable format.  Article IV of the Agreement obliges you, *inter alia*, to account at regular intervals with details of sales made. . . .
> You have repeatedly failed to adhere to these clauses of the Agreement.  We do not at this stage intend providing precise details concerning each of these

15

breaches, but your repeated delays in providing sales returns in the correct format leave our client no option but to enforce the abovementioned Agreement.

Our client intends holding you strictly to the terms of the G.S.A. Agreement and requires, as already indicated, a full and proper reconciliation of all sales, expenses and remittances made since June 2001, by close of business on Thursday 5 February 2004.

Joint Ex. 12.

On February 4, 2004, Mr. Atkinson, on "African Global" stationary, responded to Nationwide's lawyers and disputed the claims of breach. In response to the claim that he had not remitted money to Nationwide, Mr. Atkinson stated, "I was asked to keep the funds in question off-shore by Peter Griffiths unless he specifically requested them." Joint Ex. 13. Tellingly, Mr. Atkinson stated, "[t]his fell in line with our needs here, to have sufficient cash on hand if Nationwide ceases to operate or breaches its agreements." *Id.* He also stated that he would provide "full reconciliation on or before the end of the business day Monday February 9," 2005. *Id.*

On February 5, 2004, Dave Vanniekirk of Nationwide sent an email to Ken Spitz at Value Holidays, with a copy to Ms. Harris. Defs.' Ex. 525. The email stated:

Kindly note that any files/documentation/mail/e-mail as identified by Ronnie Harris and/or such which is connected with Nationwide . . . held in your office, files and/or server, are the express property of Nationwide . . . . Please do not permit the release of any information other than on request of Ronnie Harris and upon permission of either the CEO, Mr. Vernon Bricknell or Financial Director, Mr. Peter Griffiths.

*Id.*; *see also* Defs.' Ex. 503 (email from Ms. Harris to Mr. Griffiths: "Per Ken's conversation with Vernon yesterday our position is that all records and monies are the property of Nationwide Airlines in South Africa.").

Since February 5, 2004, Ms. Harris has continued to sell Nationwide tickets in the United States and has remitted all proceeds from the sales directly to Nationwide. *See* Defs.' Ex. 502; 526.

As is evident from Mr. Griffiths's testimony and the record, Ms. Harris has, in effect, acted as Nationwide's GSA in the United States and Canada since February 5, 2004, although the parties do not have a written GSA agreement. *See* Joint Trial Mem. [doc. # 55] at 19 para. 33. Ms. Harris left Value Holidays's employ and created her own company called "Under African Skies" in February 2004. Under African Skies has office space within Value Holidays's offices in Wisconsin. Nationwide is the sole source of revenue for Under African Skies. According to Ms. Harris, Under African Skies has a sub-agency agreement with Value Holidays to provide the same ticketing and reservation services for Nationwide that Value Holidays provided when Atkinson Associates was Nationwide's GSA.

On February 9, 2004, Mr. Atkinson's lawyer, David Cohen, wrote to Nationwide's lawyer. The letter purports to be written on behalf of African Global Ltd., though no such corporation exists. The letter contained the reconciliation that Mr. Atkinson had promised in his February 4 letter and asserted that Nationwide was improperly interfering with Atkinson Associates's relationship with Value Holidays. Joint Ex. 15. The reconciliation showed that Atkinson Associates owed Nationwide $278,719.59, even after taking into account expenses and other items of alleged damage to which Atkinson Associates believed it was entitled. Nonetheless, Atkinson Associates continued to withhold the $278,719.59 from Nationwide.[3]

As a consequence, on February 12, Nationwide's lawyers wrote to Atkinson Associates's lawyers that, while Nationwide was still analyzing the reconciliation, "[i]n the meantime, our client

---

[3] Mr. Atkinson testified that the reconciliation he prepared for his lawyer's February 9 letter was erroneous because it did not deduct from the $278,719.59 a remittance of $150,000 that he had provided Nationwide in October 2003. Therefore, at trial, Mr. Atkinson asserted that as of February 9, he only owed Nationwide approximately $128,000. Regardless, it is undisputed that Mr. Atkinson did not remit any further funds to Nationwide at any time.

requires immediate payment as per your client's reconciliation of the overdue balance of $278,719.59." Joint Ex. 16. Four days later, on February 16, 2004, Nationwide's lawyers again demanded payment of the $278,719.59, plus "payment of the January 2004 sales in the region of $40,000." Joint Ex. 17. No funds were remitted to Nationwide.

On March 10, 2004, Mr. Griffiths wrote to "African Global, Attention: Neil Atkinson." Joint Ex. 18. The letter stated that, in accordance with Article VIII of the GSA Agreement, Nationwide was terminating the GSA Agreement upon 30 days' written notice because of African Global's material breach of the agreement. Specifically, Mr. Griffiths stated that African Global "repeatedly has failed to pay the monies due to Nationwide under the Agreement, despite Nationwide's repeated demands for compliance." *Id.* In fact, to this day, neither Mr. Atkinson nor Atkinson Associates has paid Nationwide any of the funds in their possession that are attributable to sales of Nationwide tickets. According to Defendants, they are entitled to retain those funds in their possession to cover the damages they sustained as a result of Nationwide's breach of the GSA Agreement and tortious interference with Defendants' relationship with Value Holidays.

On March 17, 2004, Mr. Atkinson sent Nationwide a letter in which he again asserted that Nationwide had breached the GSA Agreement by telling Value Holidays to send remittances directly to Nationwide. He also stated that the funds that Value Holidays had sent him in mid-January were "presently being held pending our claims against [V]alue Holidays for both material breach and defamation." Joint Ex. 19. Neither Mr. Atkinson nor Atkinson Associates ever sued Value Holidays.

During the course of this litigation, Mr. Atkinson has continued to maintain the $300,000 that he transferred into the Citibank account. Following trial, the parties agreed that he would continue

to do so pending this Court's ruling on the merits of the parties' claims. *See* Order [doc. # 98]; Stipulation [doc. # 95].

## II.

The Court will first address liability on each of Nationwide's claims and then turn to Defendants' counterclaims.[4] Thereafter, the Court will address damages. Nationwide asserts three claims against Defendants–breach of contract, conversion, and statutory theft under Conn. Gen. Stat. § 52-564.

### A. Breach of Contract

**1.** A threshold issue on Nationwide's breach of contract claim is who among the Defendants is liable for any breach of the GSA Agreement. Nationwide contends that because Atkinson Associates was a dissolved corporation at the time the GSA Agreement was executed, Mr. Atkinson contracted with Nationwide in his individual capacity, and he is individually liable for any breach. Alternatively, Nationwide contends that both Mr. Atkinson and Atkinson Associates are jointly and severally liable for any breach because Mr. Atkinson contracted on behalf of an undisclosed principal.

The GSA Agreement recites that the contracting parties are Nationwide and "AFRICAN GLOBAL, Ltd., a North American corporation . . . having its principal place of business at 100 Ralsey Road, Stamford, Connecticut." Joint Ex. 8. It is undisputed that no corporation by the name of African Global Ltd. existed then or exists today. African Global was and is merely a trade name, and Mr. Atkinson admitted that he never registered that trade name in any jurisdiction. Furthermore,

---

[4] Before trial, Nationwide abandoned its Fourth Count for an Accounting and, during trial, Nationwide abandoned all claims against Mrs. Atkinson. Defendants agreed to dismiss their Sixth Counterclaim for an Accounting and their Fifth Counterclaim for Defamation.

it is also undisputed that Mr. Atkinson never informed anyone from Nationwide that he was contracting on behalf of Atkinson Associates. So far as the record shows, Nationwide was never aware of any corporation called Atkinson Associates and had no way of learning of the existence of such a corporation. Thus, at best, Mr. Atkinson was contracting on behalf of an undisclosed principal, Atkinson Associates.

As both parties acknowledged at oral argument, under Connecticut law, an individual who contracts on behalf of an undisclosed principal may be held personally liable on the contract. *See, e.g.*, *Rich-Taubman Assocs. v. Comm. of Rev. Serv.*, 674 A.2d 805, 808 (Conn. 1996) ("To avoid personal liability, an agent must disclose to the party with whom he deals both the fact that he is acting in a representative capacity and the identity of his principal."); *Robert T. Reynolds Assocs., Inc. v. Asbeck*, 580 A.2d 533, 536 (Conn. App. Ct. 1990) (same). Nationwide contends that when an agent contracts on behalf of an undisclosed principal, the agent and principal are jointly and severally liable for any breach, while Defendants argue that after discovery of the identity of the principal for whom the agent was acting, the contracting party must elect whether to hold the agent or the principal liable, but not both.

Early Connecticut Supreme Court decisions suggest that Defendants are correct. *See Jones v. Aetna Ins. Co.*, 14 Conn. 501, 507 (Conn. 1842) ("[T]he rule of law is, that if a person deals with another, not knowing of his agency, when the principal is disclosed, he may pursue the principal; but if he elects to give the credit to the agent, he cannot pursue the principal."); *see also Merrill v. Kenyon*, 48 Conn. 314, 319 (Conn. 1880) (upholding jury charge that instructed the jury that following the disclosure of the principal, "[t]he plaintiffs were entitled to the right of an election to charge the [principal]," as opposed to the agent). Defendants' position also reflects the current state

of the law in most jurisdictions. Thus, the Restatement, though criticizing the concept of election in these circumstances, nonetheless acknowledges in the black letter that the agent for an undisclosed principal "is discharged from liability if the [third party] obtains a judgment against the principal." Restatement (Second) of Agency § 337; *see id.* § 210(1) & Comment a (describing the black letter as the "prevailing judicial viewpoint"). In other words, a third party who discovers the existence of the undisclosed principal may obtain a judgment against either the agent or the principal, but not both, and though the third party may join both the principal and the agent in the same action, the third party must make its choice known before judgment is entered. *Id.* Comment b ("Procedurally, it is possible for the third party to join the principal and the agent in one action and make his choice between principal and agent after the evidence is in.").

The Court recognizes that the Restatement's view is not without its critics. *See Grinder v. Byrans Road Bldg. & Supply Co.*, 432 A.2d 453, 464 (Md. 1981); *see also Ore Steamship Corp. v. D/S A/S Hassel*, 137 F.2d 326, 330 (2d Cir. 1943) (calling the election doctrine a "harsh doctrine, resting at most on a rather barren logic"); *Johnson & Higgins v. Charles F. Garrigues Co.*, 30 F.2d 251, 254 (2d Cir. 1929) ("[T]hat anything less than a complete satisfaction or an estoppel in pais affords no logical basis for barring a remedy against both agent and undisclosed principal . . . .") (Hand., A., dissenting). However, since the Connecticut Supreme Court ordinarily follows the Restatement on matters of common law and early Connecticut Supreme Court opinions suggest the same outcome, the Court will follow the Restatement's approach. Therefore, Nationwide may obtain a judgment for breach of contract against Mr. Atkinson personally or Atkinson Associates, but not both. In closing arguments, counsel for Nationwide informed the Court that if it had to choose,

Nationwide would seek judgment against Atkinson Associates–which currently holds $300,000 in its bank account–not Mr. Atkinson individually.

Nationwide conditioned its choice, however, on this Court finding "that Atkinson Associates is a validly existing corporation by operation of the reinstatement under Connecticut law." Plaintiff's Post Trial Brief [doc. # 96] at 1. Connecticut General Statutes § 33-892(a) provides that "[a] corporation administratively dissolved may apply to the Secretary of the State for reinstatement after the effective date of dissolution." More important for this case, subsection (c) states, "[w]hen the reinstatement is effective, it relates back to and takes effect as of the effective date of the administrative dissolution and the corporation resumes carrying on its business as if the administrative dissolution had never occurred."

There is no dispute that Atkinson Associates was dissolved before the GSA Agreement was signed, that the corporation applied for reinstatement during the course of this litigation, and that the corporation was granted reinstatement by the Secretary of the State before trial and while this action was pending.[5]  According to Nationwide, since Atkinson Associates was a dissolved corporation at the time of the GSA Agreement, Mr. Atkinson could not have contracted on behalf of the corporation and therefore, Mr. Atkinson must be personally liable for breach of the GSA Agreement.

The Court disagrees with Nationwide for two reasons.  First, there is no question that Atkinson Associates was reinstated before trial and before Nationwide's election to seek judgment against the undisclosed principal, Atkinson Associates.  According to the plain language of § 33-892(c), Atkinson Associates's reinstatement was retroactive "as if the administrative dissolution had

---

[5]  Atkinson Associates continued to file state and federal corporate income tax forms during the relevant time period, lending credence to Mr. Atkinson's testimony that he did not know that the company had been dissolved and that the failure to file annual reports was an oversight.

never occurred." Therefore, at the time Nationwide made its election, Atkinson Associates was a corporation in good standing and fully capable of responding to any judgment the Court might enter against the corporation as principal on the GSA Agreement.

Second, and more fundamentally, the Court disagrees with Nationwide's interpretation of § 33-892(b). The Connecticut Supreme Court has never addressed the effect of § 33-892(b). However, in *J.M. Lynne Co. v. Geraghty*, 528 A.2d 786 (Conn. 1987), the Connecticut Supreme Court considered a similar New York statute, which provided that when a dissolved corporation pays all back franchise taxes, it has the effect of "annulling" a prior dissolution, and the corporation "shall thereupon have such corporate powers, rights, duties and obligations as it had on the date of [dissolution], with the same force and effect as if such [dissolution] had not [taken place]." *Id.* at 788; *see* N.Y. Tax Law § 203-a(7). The Connecticut Supreme Court rejected the defendant's argument that the reinstatement of his corporation retroactively validated his prior acts performed on behalf of the corporation and relieved him of personal liability. *Id.* The court did so based on its analysis of a New York Supreme Court decision, *Poritzky v. Wachtel*, 27 N.Y.S.2d 316 (N.Y. Sup. Ct. 1941). The Connecticut Supreme Court construed *Poritzky* to hold that, notwithstanding the New York statute, a corporate officer who carried on the business of a dissolved corporation remained individually liable because a contrary conclusion would encourage fraud and abuse. *See J.M. Lynne Co.*, 528 A.2d at 790. The court also stated that the "majority rule is that officers may be held personally responsible for contracts made when a dissolved corporation continues to conduct business, regardless of subsequent statutory reinstatement." *Id.* at 789; *see also Fox Run Mall Assoc. Ltd. v. Lawler*, No. CVH-5842, 2001 WL 65592, at *3 (Conn. Super. Ct. Jan. 15, 2001) (stating the same principle).

Defendants note that more recently the Second Circuit has rejected the interpretation of New York law advanced by the Connecticut Supreme Court in *J.M. Lynne*. In *L-Tec Elec. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85 (2d Cir. 1999), Judge Jose Cabranes, writing for the Second Circuit, "found strong indicators in the law of New York" that officers should not be held personally liable when they carry on the business of a corporation that is temporarily dissolved and later reinstated. *Id.* at 87; *see also Lodato v. Greyhawk N. Am., LLC*, 807 N.Y.S.2d 818, 824 (N.Y. Sup. Cit. 2005) (finding no individual liability in the absence of fraud). The indicators considered by the Second Circuit included the statute cited in *J.M. Lynne* and the fact that New York law recognized that "a person who deals with a *de facto* corporation cannot later deny its existence and proceed against its officers personally." *L-Tec Elec. Corp.*, 198 F.3d at 87 (*citing Prentice Corp. v. Martin*, 624 F. Supp. 1114, 1115 (E.D.N.Y. 1986)). Furthermore, at least two Superior Court decisions have construed Conn. Gen. Stat. § 33-892(b), or its non-stock corporation cognate, to insulate individual defendants from personal liability for the actions of a dissolved corporation that is later reinstated. *See Duncan v. Junior Achievement, Inc.*, No. CV96 0335878, 1998 WL 437325, at *2 (Conn. Super. Ct. July 19, 1998); *Karp v. Am. Legion Dept. of Conn., Inc.*, No. CV 930462879S, 1996 WL 457012, at *2 (Conn. Super. Ct. June 18, 1996).

In deciding this question of state statutory interpretation, the Court believes that in the circumstances of this case, the Connecticut Supreme Court would hold that Mr. Atkinson is not personally liable even though his corporation was dissolved at the time of the GSA Agreement. First, the plain language of § 33-892(b) suggests that the acts of a reinstated corporation are retroactively validated, at least in the absence of any showing or–as here–even hint of fraud or bad faith. After all, the language of the statute states that upon reinstatement, the corporation resumes

24

its business "as if the . . . dissolution had never occurred." Here, too, there is no indication that Mr. Atkinson was even aware of the dissolution of his corporation at the time of the GSA Agreement. And, importantly, it is apparent from the testimony of Messrs. Atkinson and Hoare, and from the GSA Agreement itself, that Nationwide clearly understood that it was contracting with Mr. Atkinson's company (though it did not know the correct name of the company) and not with Mr. Atkinson individually. Thus, Nationwide understood that Mr. Atkinson was acting as an agent for a principal.

Second, what the Supreme Court stated in *J.M. Lynne* was heavily influenced by its reading of a New York Supreme Court decision, which has since been criticized, *see Prentice*, 624 F. Supp. at 1115, and rejected by the Second Circuit in *L-Tec*. It is true that the *J.M. Lynne* court also referred to what it described as the "majority rule." However, which rule is the "majority" one is less clear at this point. According to at least one leading treatise, "in most jurisdictions, the reinstatement of a corporation following dissolution by administrative action of the state relates back to the effective date of dissolution, and directors or officers are not personally liable for actions undertaken during the period of dissolution or suspension." 16A *Fletcher Cyc. Corp.* § 8117. Numerous courts have held that in the absence of a showing of fraud or bad faith, officers of a dissolved corporation are not personally liable for the corporation's contracts. *See id.* (citing cases).

Third, though this Court is not bound by *Duncan* or *Karp*, both of those Superior Court decisions reject individual liability where, as here, there was no showing of fraud and the corporation was reinstated promptly upon discovery of the dissolution. Finally, Connecticut recognizes the *de facto* corporation doctrine, and therefore, Connecticut does not always reject corporate liability when faced with the actions of an agent on behalf of a dissolved corporation. *See Clark-Franklin-Kingston*

*Press, Inc. v. Romano*, 529 A.2d 240, 243 n.2 (Conn. App. Ct. 1987) (recognizing that in the period between dissolution and reinstatement, a corporation operated as a *de facto* corporation and distinguishing *J.M. Lynne* because in that case, there was no "good faith[] attempt to reinstate the corporation upon learning of its dissolution"); *see also L-Tec*, 198 F.3d at 87 (referring to New York's *de facto* corporation doctrine). Therefore, the Court concludes that the mere fact that Atkinson Associates was a dissolved (but later reinstated) corporation at the time of the GSA Agreement does not make Mr. Atkinson individually liable for breach of that contract.

Since Nationwide has now chosen to obtain judgment against Atkinson Associates and not Mr. Atkinson individually, any judgment for breach of contract will enter against Atkinson Associates.[6] *See RWP Consol. LP v. Salvatore*, 460 F. Supp. 2d 351, 356 (D. Conn. 2006) ("'[I]t is the general rule that an undisclosed principal may at any time appear in his true character and claim all the benefits of an agreement from the other contracting party since the contract of an agent is in law the contract of the principal.'") (*quoting Robert Lawrence Assocs. v. Del Vecchio*, 420 A.2d 1142, 1149 (Conn. 1979)).

**2.** Turning to the merits of Nationwide's breach of contract claim, the Court has no doubt that Atkinson Associates materially and fundamentally breached the GSA Agreement in January 2004. Among other things, the GSA Agreement required Atkinson Associates to collect payments for all transportation sold and to pay such amounts to Nationwide in accordance with Article IV of the agreement. *See* Joint Ex. 8, Art. II, para. J. Article IV, paragraph D states that

---

[6] Mr. Atkinson can be held personally liable on Nationwide's two tort claims. *See Scribner v. O'Brien, Inc.*, 363 A.2d 160, 168 (Conn. 1975) ("Where, however, an agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby.").

Atkinson Associates was responsible for collection of the correct passenger fares and "shall account and be responsible to Nationwide Airlines for all amounts owed on account of such sales of transportation on Nationwide Airlines, including those made by subcontractors, subagents or other designated sales agents in the territory." *Id*., Art. IV, para. D. Finally, Article VIII, paragraph A.1 states that "it is expressly understood and agreed that the failure to pay any money when due shall constitute a material breach." There is no dispute that in August 2003 and in January 2004, and indeed, to this very day, Atkinson Associates has withheld substantial amounts from Nationwide that were owed under the GSA Agreement. Whether the amount withheld is $184,042.90, as Atkinson Atkinson now concedes, *see* Defs.' Ex. 539, or much more, as Nationwide argues, is irrelevant. In either case, Atkinson Associates withheld a substantial amount of Nationwide's money from Nationwide contrary to the express terms of the GSA Agreement. As such, Atkinson Associates materially breached the GSA Agreement. *See Chiulli v. Zola*, 905 A.2d 1236, 1243 (Conn. App. Ct. 2006) (explaining the elements of a breach of contract action).

In response, Atkinson Associates makes two arguments. First, it counters that Messrs. Hoare and Griffiths had authorized Mr. Atkinson to hold sums in the United States and not make monthly remittances to Nationwide. The Court will assume *arguendo* that Messrs. Hoare and Griffiths gave Mr. Atkinson the authorization he claims. It is of no moment, however, because even Mr. Atkinson acknowledges that under the terms of his alleged authorization, he was required to remit funds to Nationwide whenever he was asked for them. And, further, Mr. Atkinson admits that Mr. Griffiths asked for all money due Nationwide in late July 2003 and again in January, February, and March 2004, and that Mr. Atkinson did not comply with any of those requests.

In particular, Mr. Griffiths made a demand for all money owed Nationwide on January 26, 2004. Yet, Mr. Atkinson refused to comply. He wired only $86,000 to Mr. Griffiths, even though at the time Atkinson Associates had hundreds of thousands of additional dollars that belonged to Nationwide. It is true that Mr. Atkinson asserts that his computer had crashed at the most inconvenient of moments. Even if the Court were inclined to credit that excuse–and the Court is not–Mr. Atkinson acknowledged on the witness stand that Atkinson Associates held over $400,000 in the Chase Bank Accounts at that time and he knew that Nationwide was owed much more than $86,000. Yet, he withheld anything more than $86,000 and took the extraordinary act of transferring money out of the Chase Bank Accounts so as to preclude any attempt by Nationwide to attach the accounts. To his credit, Mr. Atkinson candidly acknowledged that his purpose in withholding Nationwide's funds and moving them to another bank was to gain leverage over Nationwide so as to extract a settlement of the parties' brewing disputes. Though Mr. Atkinson's self-help measures are perhaps understandable, they nevertheless provide no excuse for Atkinson Associates's breach of its contractual obligations and duties to Nationwide.

Atkinson Associates also seeks to excuse its withholding of Nationwide's funds because there had not yet been a final accounting of the amounts due to Nationwide and because Nationwide was liable to Atkinson Associates for tortious interference. The GSA Agreement supplies the answer to the first excuse. It expressly provides that a failure to pay "*any* monies when due shall constitute a material breach." Joint Ex. 8, Art. VIII, para. A.1 (emphasis added). While the parties might have disagreed about the precise sum due, there is no question monies were withheld from Nationwide and not paid when due. Indeed, Mr. Atkinson acknowledged as much in his emails and letters to Nationwide and in his testimony to the Court. Moreover, the GSA Agreement provides that all

amounts collected by GSA for transportation, "including any remuneration which GSA is entitled to claim hereunder, are the property of Nationwide Airlines and shall be held by GSA in trust for Nationwide Airlines on behalf of Nationwide Airlines until satisfactory accounted for and full settlement has been made."  Joint Ex. 8, Art. IV, para. G.  Article V, paragraph D also gives Nationwide the right to withhold any and all payments otherwise owed the GSA until any actual payment shortages are satisfied.  Rather than holding Nationwide's money in trust, as the GSA Agreement requires it to do, Atkinson Associates moved Nationwide's funds from one account to another to gain leverage over Nationwide and to avoid attachment.  Moreover, certainly by April 2004, Atkinson Associates understood full well that it owed Nationwide substantial sums (even if the exact amount was not fully known) and yet, even then it withheld the funds from Nationwide.

As to the tortious interference claim, there is no question that such a claim did not arise until, at the earliest, February 2, 2004, when Messrs. Bricknell and Griffiths spoke to Ms. Harris of Value Holidays.  Yet, Atkinson Associates withheld the money it owed Nationwide on January 26 and moved the money from one account to another on January 29, well before any possible tortious interference claim had arisen.  The desire to obtain leverage over Nationwide, not a response to tortious interference, was the real reason for Atkinson Associates's breach of the GSA Agreement.  Therefore, Nationwide is entitled to judgment against Atkinson Associates on the First Count of its Amended Complaint [doc. # 32] for breach of contract.

### B.    Conversion

The Connecticut Supreme Court has defined conversion as

> an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights . . . .  The essence of the

> wrong is that the property rights of the plaintiff have been dealt with in a manner
> adverse to him, inconsistent with his right of dominion and to his harm.

*Macomber v. Travelers Prop. & Cas. Corp.*, 804 A.2d 180, 198-99 (Conn. 2002) (internal quotation

marks and citations omitted); *see also Label Sys. Corp. v. Aghamohammadi*, 852 A.2d 703, 728

(Conn. 2004) (defining conversion).  Money can be the subject of an action for conversion.  *See*

*Omar v. Mezvinsky*, 533, 537 A.2d 1039, 1041 (Conn. App. Ct. 1988) (*citing Devitt v. Manulik*, 410

A.2d 465, 468 (Conn. App. Ct. 1979)).  However, "[a] mere obligation to pay money may not be

enforced by a conversion action . . . and an action in tort is inappropriate where the basis of the suit

is a contract, either express or implied."  *Macomber*, 804 A.2d at 199 (internal quotation marks

omitted); *see Deming v. Nationwide Mut. Ins. Co.*, 905 A.2d 623, 640 (Conn. 2006) (stating the same

principle).   Instead, "it must be shown that the money claimed, or its equivalent, at all times

belonged to the plaintiff and that the defendant converted it to his own use."  *Macomber*, 804 A.2d

at 199 (internal quotation marks omitted).

Nationwide argues that what distinguishes this case from an ordinary breach of contract

action is that the funds in the Chase Bank Accounts belonged to Nationwide under the terms of the

GSA Agreement and that Mr. Atkinson not only transferred those funds to the Citibank accounts but

he used them for his own purposes, such as the payment of his own legal fees in this litigation.

However, it is undisputed that Nationwide was invited by Defendants at the outset of this case to

seek an attachment, and Nationwide chose not to do so.  Moreover, Defendants have maintained the

$300,000 in the Citibank accounts during the entire course of this litigation and stand ready even

now to disburse whatever net amount is owed to Nationwide.  Finally, while it is true that Mr.

Atkinson has spent a good deal of the money in the Chase Bank Accounts on his own affairs, those

accounts included monies that belonged to Atkinson Associates, since he commingled Atkinson Associates's own funds with Nationwide's in those accounts.

Therefore, Defendants can be said to have "spent Nationwide's money" only if the Court were to award a judgment to Nationwide in excess of the $300,000 that is still maintained in the Citibank accounts. Since, as is discussed below, the Court's award to Nationwide is less than $300,000–the net amount owed Nationwide is only approximately $200,000–the Court cannot find that Defendants appropriated to themselves money that rightly belonged to Nationwide or that Nationwide was harmed by the transfers that Mr. Atkinson made among the Atkinson Associates's bank accounts. *See, e.g.*, *Label Sys.*, 852 A.2d at 728 (a conversion plaintiff must demonstrate harm); *Stein v. Baron*, No. CV-92-0340587-S, 1995 WL 9489, at *2 (Conn. Super. Ct. Jan. 4, 1995) (rejecting conversion claim where defendant refused to deliver cash to plaintiff during course of litigation pending judgment of the court). In short, this remains a contract dispute at heart, despite the best efforts of both parties to dress it up in tort clothing. *See, e.g.*, *Alliance Group Servs., Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157, 170 (D. Conn. 2005) ("A claim of conversion cannot be predicated on a mere breach of contract. . . . Where the contractual relationship of the parties defines the rights of each, the breach of that contract does not result in a wrong which is separately actionable."); *Nattell, L.L.C. v. SAC Capital Advisors*, No. 3:04CV1061 (JBA), 2005 WL 2253756, at *10 (D. Conn. Sept. 16, 2005 ) ("That a defendant merely owes a monetary obligation to a plaintiff is insufficient to state a conversion claim."). Therefore, judgment will enter for Defendants on the Second Count of Nationwide's Amended Complaint.

## C. Statutory Theft

What the Court has said about the conversion claim largely disposes of Nationwide's statutory theft claim. But even if the Court were wrong about Nationwide's conversion claim, it would still not find that statutory theft was proven in this case.

Section 52-564 of the Connecticut General Statutes provides that "[a]ny person who steals any property of another or knowingly receives and conceals stolen property, shall pay the owner treble his damages." The Connecticut Appellate Court has stated that "[s]tatutory theft under § 52-564 is synonymous with larceny under General Statutes § 53a-119." *Lawson v. Whitey's Frame Shop*, 682 A.2d 1016, 1021 (Conn. App. Ct. 1996) *rev'd in part on other grounds* 697 A.2d 1137 (Conn. 1997). Because of this, a plaintiff must establish the elements of statutory theft by the heightened standard of clear and convincing evidence. *See Fenn v. Yale Univ.*, No. Civ.A. 396CV(CFD), 2005 WL 327138, at *1-*2 (D. Conn. Feb. 8, 2005). The Connecticut Appellate Court has explained that "[c]onversion can be distinguished from statutory theft as established by § 53a-119 in two ways. First, statutory theft requires an intent to deprive another of his property; second, conversion requires the owner to be harmed by a defendant's conduct." *Lawson*, 682 A.2d at 1021.

Here, the Court does not find that Mr. Atkinson intended to deprive Nationwide of its property. Mr. Atkinson certainly intended to withhold funds in order to obtain leverage over Nationwide, at least in the short term, but the Court cannot find by even a preponderance of the evidence, let alone by clear and convincing evidence, that Mr. Atkinson intended to steal Nationwide's money or to deprive Nationwide of it. Had that been his intent, he would have spent the money in the Citibank accounts long before now. Instead, the Court finds that the parties had

a good faith and legitimate dispute about their respective contractual obligations. Conduct of that sort does not constitute statutory theft. *See Lawson*, 682 A.2d at 1021. Therefore, the Court grants judgment for Defendants on the Third Count of Nationwide's Amended Complaint.

## III.

The Court next addresses Nationwide's liability on Defendants' Counterclaims.

### A. Breach of Contract

Atkinson Associates asserts that Nationwide breached the GSA Agreement in a number of ways, though its principal claim on the First Count of Defendants' Counterclaims [doc. # 5] is that Nationwide wrongfully terminated the GSA Agreement without the notice and opportunity to cure as provided by the GSA Agreement.

Article VIII, paragraph A of the GSA Agreement permits either party "upon not less than thirty (30) days advance written notice," to terminate the agreement upon the occurrence of a material breach that "remains uncured at the end of such thirty (30) day period." Joint Ex. 8, Art. VIII, para. A. Atkinson Associates contends that Nationwide breached this provision by effectively terminating the GSA Agreement in early February 2004 when Nationwide informed Value Holidays to stop sending payments to Mr. Atkinson and Nationwide effectively appointed Ronnie Harris as its GSA for North American and Canada.

The Court agrees. As discussed previously, as of late January 2004, Atkinson Associates was in material breach of its obligations under the GSA. Therefore, Nationwide was fully entitled at that time to terminate the GSA Agreement "upon not less than thirty (30) days advance written notice" and so long as the breach remained "uncured at the end of such thirty (30) day period." *See* Joint Ex. 8, Art. VIII, para. A.1. Yet, without providing any advance written notice or opportunity to cure,

Nationwide, in early February, effectively terminated the GSA Agreement when it substituted Ms. Harris for Atkinson Associates as Nationwide's GSA in the United States and Canada. Nationwide's counsel apparently realized this error in March, and thereupon Mr. Griffiths sent Mr. Atkinson a letter providing written notice of breach and that the GSA Agreement would be terminated effective thirty days thereafter. *See* Joint Ex. 18. Therefore, the Court finds that Nationwide breached the GSA Agreement when it failed to give Atkinson Associates thirty days' advance written notice of termination.

Whether Nationwide breached the GSA Agreement in this regard is less controversial than what remedy Atkinson Associates should receive as a result of the breach. Nationwide contends that its breach of the notice of termination provision merely entitles Atkinson Associates to lost profits for the period from February 2 to April 10, 2004, when the formal written termination, which was never cured, became effective. Atkinson Associates counters that Nationwide's wrongful termination of the GSA Agreement in February effectively denied Atkinson Associates the right to cure its breach, and therefore, Nationwide's termination notice on March 10 was ineffective, entitling Atkinson Associates to lost profits to this very day.

On this point, the Court agrees with Nationwide. *See, e.g.*, *W. Haven Sound Dev. Corp. v. W. Haven*, 514 A.2d 734, 742 (Conn. 1986) (noting that damages for breach of contract are designed to place the injured party in the same position it would have been in had the contract not been breached). The GSA Agreement gave Nationwide the right to terminate upon thirty days' advance written notice. Though belated, Nationwide gave the required written notice in late March. *See* Joint Ex. 18. Therefore, this case is unlike those cited by Defendants, in which no notice of termination was ever provided.

34

Furthermore, contrary to its claim, Atkinson Associates was not deprived of the opportunity to cure its breach. The only breaches referred to in Mr. Griffiths's letter were Atkinson Associates's failure to provide the sales reports required by the GSA Agreement and to remit the monies due Nationwide. It is undisputed that Atkinson Associates never provided the January 2004 TSR, even though Atkinson Associates certainly could have done so, at least with regard to the information it possessed at the time. More fundamentally, Atkinson Associates never remitted another dime to Nationwide even though it acknowledged that it owed Nationwide considerable money. For example, in his February 9, 2004 letter to Nationwide, Mr. Atkinson provided Nationwide with an exhibit that showed that Atkinson Associates owed Nationwide $278,719.59. *See* Joint Ex. 15. Yet, Mr. Atkinson refused to remit any of those funds to Nationwide.

Nothing that Nationwide did prevented Mr. Atkinson from curing the breach by paying Nationwide some or all of the money it was owed under the GSA Agreement. He had the funds in an Atkinson Associates account. Yet, he steadfastly refused to pay them over to Nationwide, not because he was unable to do so as a result of Nationwide's breach (and not even because he was uncertain about how much was owed because of Nationwide's request that Value Holidays not share Nationwide records with Mr. Atkinson), but rather because Mr. Atkinson had decided he needed leverage in order to negotiate a favorable resolution of his dispute with Nationwide. This case is thus a far cry from those cases relied on by Defendants, where a party is deprived of a contractually required opportunity to cure because of an improper termination. *See, e.g.*, *Bausch & Lomb Inc., v. Bressler*, 977 F.2d 720, 727 (2d Cir. 1992); *Dunkin' Donuts, Inc. V. N.A.S.T., Inc.*, 428 F. Supp. 2d 761, 772 (N.D. Ill. 2005).

35

Therefore, for Nationwide's breach of the termination provision of the GSA Agreement, Atkinson Associates is entitled only to recover damages up to and including April 10, 2004, when, according to Nationwide's valid and uncured termination notice, the GSA Agreement terminated. *See Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186-87 (2d Cir. 1995) ("Those constructively-terminated plaintiffs not given the requisite 60-days notice are entitled to damages for lost profits during the time the realignment was in effect without the requisite notice . . . ."); *McKeown Distribs., Inc. v. Gyp-Crete Corp.*, 618 F. Supp. 632, 643 (D. Conn. 1985) (stating that a violation of the advance notice of termination required by the Connecticut Franchise Act "at most would entitle [the plaintiff] to recover lost profits for the thirty additional days it would have been in operation prior to the date that termination would be permitted under the . . . Act"); *see also Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 893 (4th Cir. 1992) (stating that in a suit for breach of contract regarding a provision requiring six months notice of termination, plaintiff's remedy was limited to lost profits for the six months following the breach).

Atkinson Associates advances two other breaches by Nationwide.  For one,  Atkinson Associates argues that Nationwide breached the GSA Agreement by failing to reimburse Atkinson Associates for expenses.  But Nationwide did not commit a breach in that regard.  It was Atkinson Associates that held the funds, not Nationwide, and Mr. Atkinson admitted that it was the parties' practice to have Atkinson Associates deduct expenses from the amounts it otherwise owed Nationwide.  *See* Joint Ex. 8, Ex. E, para. 5 (expenses "to be deducted from the monthly sales return").  Furthermore, the GSA Agreement provides that in the event of a payment shortage, "Nationwide Airlines shall be entitled to withhold any and all payments otherwise owed to GSA until any actual payment shortages are satisfied." *Id.*, Art. V, para. D.  As discussed below, Atkinson

Associates is entitled to recover its expenses by way of a set off against amounts otherwise owed Nationwide. *See id.*, Art. IV, para. G (all funds belong to Nationwide "until satisfactory accounted for and full settlement has been made").

Defendants also contend that independent of the wrongful termination, Nationwide separately breached the GSA Agreement by informing Value Holidays to send payments directly to Nationwide and by appointing Ronnie Harris as its GSA. The Court does not find that these acts by Nationwide constitute breaches of the GSA independent of Nationwide's breach of the termination provision discussed above. The GSA Agreement made all funds in the hands of Atkinson Associates or its sub-agents the property of Nationwide. *See* Joint Ex. 8, Art. IV, para. G. Given Atkinson Associates's breach of the GSA Agreement by failing to remit funds it owed Nationwide, it was perfectly sensible and consistent with the GSA Agreement for Nationwide to direct Value Holidays to remit funds directly to Nationwide until matters were settled with Mr. Atkinson. As to Ms. Harris, the Court agrees that until the GSA Agreement was properly terminated, Nationwide had no right to appoint Ms. Harris as its GSA in the United States and Canada, but following the proper termination in April 2004, Nationwide was perfectly within its right to appoint another GSA. In any event, the Court cannot see how Atkinson Associates would be entitled to any different or greater damages for these alleged breaches than for the breach of the termination provision discussed above.

Finally, Defendants assert that Nationwide breached the GSA Agreement when Nationwide cancelled certain flights to Kilimanjaro, Tanzania for which Atkinson Associates, via Mr. Atkinson, had underwritten or guaranteed a "hard block" of seats. *See* Pl.'s Ex. 276; Def. Ex. 528. Defendants seek damages of $14,498.15. *See* Def. Ex. 539.

In support of their claim, Defendants lean heavily upon an email string involving a number of Nationwide employees. *See* Defs.' Ex. 528. But that email string does not say anything about flight cancellations or what would happen to Mr. Atkinson's guarantee in the event Nationwide chose to discontinue the flights. Indeed, Mr. Atkinson admitted that the email string was not the "final agreement" of the parties regarding the Kilimanjaro flights. He also conceded that there was no writing setting forth what he contends was his agreement with Nationwide, because, as he asserts, the flights were "interrupted" before any agreement could be put in writing. Defendants also cite Mr. Atkinson's memorandum to himself regarding the flights. *See* Pls.' Ex 276. However, that document, which also says nothing about what would happen if Nationwide discontinued the Kilimanjaro flights, was never shared with Nationwide and would not, therefore, constitute an amendment to the GSA Agreement.

The Court concludes that Nationwide did not breach the GSA Agreement in connection with the cancellation of the Kilimanjaro flights. Fundamentally, the reason for this finding is that nothing in the GSA Agreement says anything about these flights or Mr. Atkinson's guarantee. Furthermore, nothing in the GSA Agreement gives Atkinson Associates the right to control Nationwide's decisions about which flights to cancel or not. According to Mr. Atkinson, this "agreement" with Nationwide occurred in 2003, and thus long after the signing of the GSA Agreement. However, the GSA Agreement provides a specific mechanism for amendments and it requires all amendments to be in writing and signed by the parties. *See* Joint Ex. 8, Art. X, para. C ("No modification to this agreement shall be effective unless it is in writing and signed by the party sought to be charged with such modification."). Defendants stipulated that there is no written agreement regarding the

Kilimanjaro flights, and therefore, Nationwide did not breach the GSA Agreement in cancelling the Kilimanjaro flights.

During the trial, the Court questioned counsel for Defendants about their breach of contract claim regarding the Kilimanjaro flights and whether their claim was founded upon a breach of the GSA Agreement, or some other, perhaps verbal, agreement. Counsel for Defendants represented to the Court that the claim was founded on a breach of the GSA Agreement, and not on any other contract.[7] Counsel's representation to the Court in this regard is further confirmed by Defendants' Counterclaim itself, which is based solely on an alleged breach of the GSA Agreement, *see* Counterclaims [doc. # 5] at 13, First Count, para. 24, and by Defendants' Joint Trial Memorandum, which states that Nationwide breached the GSA Agreement by cancelling the Kilimanjaro flights, *see* Joint Trial Mem. [doc. # 55] at 92, Proposed Conclusions of Law para. 2 ("Nationwide breached the GSA Agreement by cancelling the flights to Kilimanjaro . . . ."). Accordingly, the Court has no occasion to consider whether Nationwide breached any verbal agreement with Mr. Atkinson or Atkinson Associates by discontinuing the Kilimanjaro flights.[8] Nor does the Court have occasion to consider a promissory estoppel claim, as none was asserted.

In sum, Atkinson Associates is entitled to judgment on the First Count of Defendants' Counterclaims for the breach by Nationwide of the termination provisions of the GSA Agreement,

---

[7] Defense counsel also stated that this item had been submitted by Mr. Atkinson as an expense, but counsel agreed that Nationwide had never approved this "alleged" expense, as is required by the GSA Agreement.

[8] Even Mr. Hoare, who is a supporter of Mr. Atkinson's claims in this lawsuit, could only bring himself to say that he felt that Nationwide had "some moral obligations" to Mr. Atkinson, not contractual commitments. Hoare Dep. at 88. According to Mr. Atkinson, he decided to underwrite a portion of the Kilimanjaro flights in order to convince Nationwide to extend his GSA Agreement beyond May 2004.

though Atkinson Associates's damages are limited to the time period from February 2, 2004 to the termination of the GSA Agreement in April 2004. Atkinson Associates is also entitled to recover its expenses in accordance with the GSA Agreement.

## B. Breach of Contract – Option to Renew

In the Second Count of Defendants' Counterclaims, Atkinson Associates asserts that Nationwide breached the provision of the GSA Agreement that gave Atkinson Associates a first option to renew the GSA Agreement for an additional three years, from May 1, 2004 through April 30, 2007. Joint Ex. 8, Ex. F. As stated earlier, a hand-written addition to the GSA Agreement provided that "[f]ollowing the initial term of the Agreement, first option to renew will be offered to African Global for an additional 3 year period." *Id*. However, the option to renew was subject to the default and termination provisions of the agreement, and as rehearsed above, Nationwide had the right to terminate the GSA Agreement because of Atkinson Associates's uncured material breach and Nationwide did so, by Mr. Griffiths's letter of March 10, 2004. Joint Ex. 18; *see* Joint Ex. 8, Art. VIII, para. B ("Upon the occurrence of an event of default, the non-defaulting party may immediately declare this agreement to be terminated, subject to the right to cure set forth above, and upon such notice of termination being effective, pursue any and all remedies available at law or equity."). *See Enviro Express, Inc. v. AIU Ins. Co.*, 901 A.2d 666, 669 (Conn. 2006) ("The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so.").

In sum, the proper termination of the GSA Agreement in April 2004 terminated all of Atkinson Associates's rights under the agreement, including its option to renew. Therefore, Nationwide did not breach the GSA Agreement by denying Atkinson Associates the option to renew.

Even if the Court were wrong in this regard, Atkinson Associates acknowledged that it never exercised its right to renew. That is, Atkinson Associates never informed Nationwide that it intended to renew the GSA Agreement for an additional three years. Atkinson Associates contends that it was "prevented" from exercising the option to renew by Nationwide's "unlawful" termination. But that argument perverts the meaning of the word "prevented." Certainly, there was nothing at all to prevent Atkinson Associates, who was represented by counsel, from writing to Nationwide and informing Nationwide that Atkinson Associates elected to exercise the option to renew in the event the termination was invalidated.[9]

Accordingly, Nationwide is entitled to judgment on the Second Count of Defendants' Counterclaims.

### C. Violation of the Covenant of Good Faith and Fair Dealing

The Third Count of Defendants' Counterclaims merely incorporates by reference all of the prior paragraphs of the Counterclaims and then concludes that in "abrogating the relationship between African Global and its sub-agent Value Holidays, and in repudiating its obligations under

---

[9] Moreover, since either party may terminate the GSA Agreement after the initial term for any reason upon ninety days' notice, the Court finds that if the option to renew remained viable even after Nationwide's termination of the agreement and if Atkinson Associates had sought to exercise the option to renew, Nationwide most certainly would have sent immediate notice of termination, thereby limiting Atkinson Associates to, at most, ninety days of lost profits beyond the expiration of the initial term of the GSA Agreement. *See Care Travel Co., Ltd. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 997 (2d Cir. 1991) (stating that whether a party would have exercised a right to terminate on ninety days' notice is a factual question for the trier of fact). It is quite apparent to the Court that by the spring of 2004, at the latest, the relationship between Atkinson Associates and Nationwide had irretrievably broken down–neither party placed any degree of trust in the other. Indeed, Mr. Atkinson candidly described the parties' business relationship at this point as "perilous." Therefore, there is no reason at all to suppose that Nationwide would have been interested in continuing to do business with Mr. Atkinson.

the GSA Agreement, Nationwide has breached its duty of good faith and fair dealing owed to African Global." Counterclaims [doc. # 5] at 14-15.   Admittedly, in Connecticut "[e]very contract carries an implied covenant of good faith and fair dealing requiring neither party to do anything that will injure the right of the other to receive the benefits of the agreement." *Gupta v. New Britain Gen. Hosp.*, 687 A.2d 111, 122 (Conn. 1996); *see Celebrate Windsor, Inc v. Harleysville Worcester Ins. Co.*, No. 3:05CV282 (MRK), 2006 WL 1169816, at *13-14 (D. Conn. May 2, 2006).   However, in this case, the Court does not believe that the covenant of good faith and fair dealing adds anything to the analysis the Court has already provided of the parties' respective claims for breach of the express terms of the GSA Agreement.   For the doctrine of good faith and fair dealing is but "a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle, therefore, cannot be applied to achieve a result contrary to the clearly expressed terms of a contract, unless, possibly, those terms are contrary to public policy." *Magnan v. Anaconda Indus. Inc.*, 479 A.2d 781, 786 (Conn. 1984).

Furthermore, in order to breach the covenant of good faith and fair dealing, a party must act in bad faith, which "implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . .   Bad faith means more than mere negligence; it involves a dishonest purpose." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849 A.2d 382, 388 (Conn. 2004); *see 12 Havemeyer Place Co. v. Gordon*, 888 A.2d 141, 154 (Conn. App. Ct. 2006) ( "[B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.").   Here, while

the Court has found that Nationwide breached the GSA Agreement in certain respects, the Court does not find that in breaching the contract, Nationwide acted in bad faith, or with a dishonest purpose, or even ill will. The company was forced to make difficult decisions to protect its own legitimate interests; that it failed to follow the notice and cure provisions of the GSA Agreement in terminating Atkinson Associates does not mean that the company acted in bad faith. So far as the Court can discern, Nationwide was simply trying to protect its own legitimate interests and funds in the context of an agent whom Nationwide believed (rightly, it turned out) was improperly withholding money owed Nationwide.

Therefore, judgment will enter for Nationwide on the Third Count of Defendants' Counterclaims.

### D.    Tortious Interference

The Fourth Count of Defendant's Counterclaims asserts a claim for tortious interference with Atkinson Associates's business relations with Value Holidays. In particular, Atkinson Associates contends that Nationwide's instructions to Value Holidays to remit payments directly to Nationwide and to cease communications with and withhold records from Mr. Atkinson "destroyed [Atkinson Associates's] contractual and business relationship with Value Holidays" and "precluded [Atkinson Associates] from acting as a sales agent and was directly responsible for the collapse of [Atkinson Associates's] business." Joint Trial Mem. [doc. # 55] at 97-98.

The elements of a claim for tortious interference with business relations or expectancies are well established in Connecticut. The plaintiff must show: "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual

loss." *Hi-Ho Tower, Inc v. Com-Tronics, Inc.*, 761 A.2d 1268, 1273 (Conn. 2000). However, "'[n]ot every act that disturbs a contract or business expectancy is actionable'" as tortious interference. *Fenn*, 283 F. Supp. 2d at 639 (*quoting Blake v. Levy*, 464 A.2d 52, 54 (Conn. 1983)). To establish tortious interference, the plaintiff must show that the defendant intended to interfere with the relationship and that he acted with "some improper motive or improper means. . . . [A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." *Blake*, 464 A.2d at 55. This element of "improper motive or improper means" may be satisfied "by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." *Id.* at 54 (internal quotation marks omitted); *see McCullough v. Hartford Life & Acc. Ins. Co.*, 363 F. Supp. 2d 169, 180 (D. Conn. 2005) (stating that interference must adversely affect business relations and be "motivated by some improper means or motive, such as maliciousness, fraud or ill will"); *Fenn*, 283 F. Supp. 2d at 639 (stating same principle).

The Court has little difficulty concluding that Nationwide did not tortiously interfere with Atkinson Associates's business relations when Nationwide in February 2004 directed Value Holidays to remit funds directly to Nationwide. Under the terms of the GSA Agreement, Nationwide had every right to require Value Holidays, a sub-agent appointed under and approved by Mr. Hoare in accordance with the GSA Agreement, to remit funds attributable to ticket sales directly to Nationwide, at least pending resolution of the amounts owed Nationwide by Atkinson Associates. The GSA Agreement could not be clearer: Article II, paragraph J of the GSA required the "GSA to collect payments for all transportation sold in the territory by GSA, and its subcontractors and subagents, . . . [and] pay such amounts to Nationwide Airlines in accordance with Article IV of this

agreement." Joint Ex. 8, Art. II, para. J. Furthermore, Article IV, paragraph D stated that the GSA is "responsible for . . . all amounts owed on account of . . . sales of transportation on Nationwide Airlines, including those made by subcontractors, subagents or other designated sales agents in the territory." *Id.* Art.. IV, para. D. Importantly, the agreement provided that "[a]ll amounts collected by the GSA for transportation sold on behalf of Nationwide under this agreement, including any remuneration which GSA is entitled to claim hereunder, are the property of Nationwide Airlines . . . ." *Id.*, Art. IV, para. G. Finally, Article V stated that in the event of a payment shortage, and that was certainly the case here, "Nationwide Airlines shall be entitled to withhold any and all payments otherwise owed to GSA until any actual payments shortages are satisfied." *Id.*, Art. V, para. D.

Given the fact that Mr. Atkinson had refused to send to Nationwide the $42,790.37 that Atkinson Associates had received from Value Holidays on January 15, 2004 and further given the fact that by Mr. Atkinson's own admission, Atkinson Associates was withholding from Nationwide in excess of $150,000 (at a minimum) of funds that even he acknowledged belonged to Nationwide, Nationwide was under no obligation to allow the Nationwide sub-agent Value Holidays to continue to pay money to Mr. Atkinson, which he could then, in turn, continue to withhold from Nationwide. This is especially true since a sub-agent, such as Value Holidays, owed the same duties to the principal, Nationwide, as the agent, Atkinson Associates, owed. *See, e.g.*, *Passarello v. Lexington Ins. Co.*, 740 F. Supp. 933, 936 (D. Conn. 1990) ("The subagent stands in a fiduciary relationship to the principal and is subject to the same liabilities as an agent."). Particularly, since the GSA Agreement recited that all of those funds, including any remuneration to which Atkinson Associates was entitled, remained the property of Nationwide until final settlement, Nationwide did not interfere

45

with any legitimate rights Atkinson Associates may have had when Nationwide instructed the sub-agent Value Holidays to make remittances for tickets sold directly to Nationwide while their dispute with Atkinson Associates remained unresolved. The Court finds that rather than acting maliciously or in bad faith in this respect, Nationwide was only trying to mitigate its damages from Atkinson Associates's material breach of the GSA Agreement.

Whether Nationwide tortiously interfered with Atkinson Associates's rights when in early February 2004 Nationwide told Value Holidays not to communicate with Mr. Atkinson or provide him any information or documentation is another question. Mr. Atkinson says that Value Holidays had in its possession all of the Nationwide ticket stock, a ticket machine, advertising material and sales records, and that as a result of Nationwide's direction to Value Holidays, he was unable to operate as a Nationwide GSA. The GSA Agreement suggests that the ticket stock, ticket machine, advertising, and even some of the sales records were the property of Nationwide, *see, e.g.*, Joint Ex. 8, Art. V, para. A, Art. X, para. A.3, and that Nationwide likely paid for most of the items, excluding the sales records.

On the other hand, it is abundantly clear that Nationwide's instructions to Value Holidays in early February interfered with Atkinson Associates's ability to continue as a Nationwide GSA. At argument, counsel for Atkinson Associates conceded that, at least insofar as the period from February 2004 to April 10, 2004–when the GSA Agreement terminated in accordance with Mr. Griffiths's March 10 letter (Joint Ex. 18)–the damages for Atkinson Associates's tortious interference claim are identical to the damages for its breach of contract claim for Nationwide's breach of the notice and cure provisions of the GSA Agreement. Therefore, the Court need not decide whether Nationwide's conduct *prior* to April 10, 2004, rose to the level of bad faith and maliciousness

required to show that Nationwide tortiously interfered with Defendants' business relations with Value Holiday, as such a finding would makes no difference in terms of Atkinson Associates's recovery.[10]

The more important question for present purposes is whether Nationwide's conduct tortiously interfered with Atkinson Associates's relationship with Value Holidays in the period *after* April 10, 2004, when Atkinson Associates was properly terminated as a Nationwide GSA. The Court finds that Nationwide did not. The Court reaches this conclusion for a number of reasons. As Mr. Atkinson conceded, his business relationship and dealings with Value Holidays was strictly limited to the sales of Nationwide tickets. Moreover, according to Mr. Atkinson, Value Holidays was responsible for less than 5% of total Nationwide ticket sales prior to January 2004. Neither he nor Atkinson Associates had any broader business relationship with Value Holidays; nor did Mr. Atkinson or Atkinson Associates have any business relationship with any airline other than Nationwide. The Court has previously determined that as of April 10, 2004, Atkinson Associates was no longer entitled to act as a Nationwide GSA and therefore, as of April 10, 2004, Atkinson Associates's rights either to appoint Value Holidays as a Nationwide sub-agent or even to conduct Nationwide business with or through Value Holidays ceased to exist.

Accordingly, Atkinson Associates's tortious interference claim is founded on its claim that Atkinson Associates had an exclusive business arrangement with Value Holidays to perform

---

[10] Whether Nationwide's conduct was characterized as tortious or merely a breach of contract would make a difference regarding whether Atkinson Associates was entitled to punitive damages, but regardless how Nationwide's conduct is characterized, the Court finds as a matter of fact that Nationwide's conduct does meet the standard for awarding punitive damages under Connecticut law. *See Hi-Ho Tower, Inc.*, 761 A.2d at 1277 (citing jury instructions that states that punitive damages require a showing of "reckless indifference" or "intentional and wanton violation" of a party's rights").

ticketing and on-line reservation services and that this arrangement continued well beyond April 10, 2004.   Therefore, according to Atkinson Associates, Nationwide interfered with that business relationship when it continued to utilize Value Holidays's services but without working through Atkinson Associates.[11]

The Court finds no basis for Atkinson Associates's claim.  First, Mr. Atkinson acknowledged that he and Value Holidays never entered into a formal sub-agency agreement.   Instead, they appeared to operate under very general terms set forth in an email that Mr. Atkinson sent Mr. Spitz in July 2004, an email that expressly stated that it was "subject to further discussion."  *See* Joint Ex. 9.  That email makes no reference at all to Atkinson Associates but rather refers to something called "Nationwide Airlines, USA," which is not a company and, at best, appears to be a "d/b/a" that Mr. Atkinson intended to use.  As Mr. Spitz testified, he thought he was dealing with Mr. Atkinson and that Mr. Atkinson was authorized by Nationwide to appoint Value Holidays as a Nationwide sub-agent. In fact, the GSA Agreement expressly authorizes Atkinson Associates to appoint sub-agents and sub-contractors to service Nationwide's business with the approval of Nationwide, and both Mr. Hoare and Mr. Atkinson testified that Mr. Hoare did, in fact, approve of the appointment of Value Holidays as a Nationwide sub-agent.

Second, and in any event, it is clear from the July 2002 email that Mr. Atkinson intended to appoint Value Holidays to act as a sub-agent for the sole purpose of performing ticketing and on-line reservations services for Nationwide Airlines.  There is no reference to any other business or airline,

---

[11]   The Court agrees with Atkinson Associates that the mere fact that a sub-agent owes fiduciary duties to the principal does not mean that the principal may tortiously interfere with the agent's business relationship with the sub-agent and nothing in this opinion should be construed to hold otherwise. *See* Joint Trial Mem. [doc. # 55], Ex. D, Defendants/Counterclaim Plaintiffs' Pretrial Brief, at 9-10.

other than the fact that the email expressly acknowledges Value Holiday's other business, including its tour business, which would have "no direct commercial connection with the sub-services agreement with Nationwide Airlines." *Id.* Thus, Mr. Atkinson's assertion at trial that, but for Nationwide's conduct, he could have used his contract and business relationship with Value Holidays to provide services to other airlines is contradicted by the documentary evidence.[12]

It is true that the email states that "[t]he initial period would be for approximately three years." *Id.* Seizing on this statement in the email, Mr. Atkinson argues that if Nationwide wished to use Value Holidays's services after April 10, 2004 (and at least up to July 2005), Nationwide had to work through Mr. Atkinson. But there is nothing in the email to indicate that Value Holidays had agreed to lock itself up for three years, regardless of whether the GSA Agreement was terminated. There is no language implying or suggesting exclusivity in any way. While the parties certainly contemplated a working relationship that would last for "approximately" three years, the email says nothing about either party's right to terminate the relationship or to do business with Nationwide in the event the GSA Agreement was terminated. In the absence of any such provision, Value Holidays was free to cease doing business with Mr. Atkinson once he had been properly terminated by Nationwide. *See 64 Wall St., LLC v. City of Norwalk*, No. FSTCV044000084, 2005 WL 2363096, at *1 (Conn. Sup. Ct. Aug. 26, 2005) (finding contract of indefinite duration terminable at will); *see*

---

[12]   Mr. Atkinson's claim is further belied by the fact that he never made any serious effort to acquire such business, no such business was abandoned because of the failure to have Value Holidays provide ticketing or on-line reservation services, and Mr. Atkinson never spoke to Value Holidays about performing any such business or sought a replacement for Value Holidays. According to Mr. Atkinson, he is not sure whether airlines would likely decline to do business with him while he was suing Nationwide.

*also* 2 Restatement (Second) of Contracts § 33(d), at 94 (1981); 1 Richard A. Lord, Williston on Contracts § 4.19, at 441-44 (4th ed. 1990).

Finally, the facts show that Value Holidays contracted with, and worked as a sub-agent for, Ronnie Harris' company, Under African Skies, and did not contract directly with Nationwide. That is, before January 2004, Atkinson Associates was the Nationwide agent and Value Holidays was the Nationwide sub-agent; after February, Under African Skies was the Nationwide agent and Value Holidays was the Nationwide sub-agent. *See* Defs.' Ex. 526. Therefore, if anyone tortiously interfered with Atkinson Associates's relations with Value Holidays after April 10, 2004 (and the Court is convinced that no one did), it was Under African Skies and not Nationwide.

## IV.    Damages

**A.    Nationwide's Damages**. The Court has found that Atkinson Associates breached the GSA Agreement by withholding monies due Nationwide under the agreement. The parties agree that the TSRs show a net amount due to Nationwide during the entire period of the GSA Agreement of $974,504.48. *See* Defs.' Ex. 539. They also agree that during the period the GSA Agreement was in effect, Atkinson Associates remitted $563,338.08, *see id.*, to Nationwide, leaving a balance due of $411,166.40. However, from that number the Court must deduct a stipulated interline commission of $1,250.00. *See id.* The Court must also deduct the unpaid expenses that Nationwide owes Atkinson Associates. The Court finds that Atkinson Associates's legitimate and approved

expenses amount to $148,967.35.  *See* Defs.' Exs. 513, 539.[13]  This leaves a balance due and owing to Nationwide of $260,949.05.

Nationwide seeks to increase that sum by $57,812.44, attributable to so-called "E&O Debits." Article IV, paragraph H of the GSA Agreement provides that the "GSA shall add or deduct the value of any debit or credit memos issued by Nationwide Airlines from the sales report next following the receipt of the debit or credit memo."  In the event of a dispute about a debit or credit memo, the agreement provides that Nationwide would provide a "written explanation of its decision to the GSA," and that absent "manifest error," Nationwide's decision would be "final."  Joint Ex. 8, Art. IV, para. H.  As Mr. Hoare testified, the E&O Debits were issued when a GSA used the incorrect fares on Nationwide tickets.  Atkinson Associates objects to Nationwide's attempt at this point to recover for E&O Debit memos because Nationwide never presented Atkinson Associates with such memos during the life of the GSA Agreement and as a result, Atkinson Associates was deprived of the opportunity to make changes to its operations to avoid incurring any further such memos.

The undisputed testimony was that any E&O Debit memos issued by Nationwide would have been sent first to Mr. Hoare for his approval and if approved, it was then his responsibility to send them to the GSA, in this case Atkinson Associates.  Mr. Atkinson denies that he ever received any E&O Debit memos from Mr. Hoare, and Nationwide has no evidence to the contrary.  Mr. Hoare testified that he agreed to write off some of the E&O Debits because, as he put it, Mr. Atkinson was

---

[13]    In opposing Atkinson Associates's expenses, Nationwide contends that Atkinson Associates is limited to $500 in expenses per month.  But a hand-written addition to Exhibit E expressly allows for "additional expenses" that are "pre-approved."  Furthermore, both Mr. Hoare and Mr. Atkinson testified that Mr. Hoare did, in fact, approve the expenses sought by Mr. Atkinson. Therefore, there is no basis for Nationwide's objection to the expenses sought by Atkinson Associates.

a "one-man show" and "mistakes can sometimes creep in." Hoare Dep. at 61. As to others now sought by Nationwide, Mr. Hoare denied ever receiving or approving them. *Id.* at 65. *But see* Pl.'s Ex. 270.

In the Court's view, Nationwide has not proved by a preponderance of the evidence that it is entitled at this late stage to recover E&O Debit memos that apparently were never approved by Mr. Hoare and were never sent to Atkinson Associates during the term of the GSA Agreement. The Court credits Mr. Atkinson's testimony that had he been aware of these items during the course of the parties' relationship, he could have taken steps to eliminate the errors that formed the basis for the debit memos. Having deprived Atkinson Associates of the ability to rectify or contest these memos during the parties' relationship–an ability to cure that the GSA Agreement appears to contemplate–Nationwide cannot after termination of the GSA Agreement retroactively seek to recover for errors that could have easily been corrected had they been brought to Mr. Atkinson's attention in a timely manner.

Finally, Nationwide seeks to recover its attorneys' fees and costs on its breach of contract claim. Nationwide bases its claim for attorneys' fees and costs on Article VII, paragraph A of the GSA Agreement, which states that the "GSA agrees to indemnify and hold harmless Nationwide Airlines . . . from any and all claims, costs . . . and liabilities of any kind, including attorneys' fees and legal expenses, arising from, or in connection with GSA's . . . performance of their duties under this agreement."

Read in context, the Court believes that this provision covers fees and expenses Nationwide might incur in connection with claims by third parties and that it does not entitle Nationwide to recover its fees and costs in the context of an action for nonpayment against Atkinson Associates.

52

*See Montoya v. Montoya*, 909 A.2d 947, 955 (Conn. 2006) ("Where the language [of a contract] is ambiguous . . . we must construe those ambiguities against the drafter."). Indeed, paragraph C of Article VII requires Nationwide and the GSA to notify the other immediately in the event any claim is brought against them arising out of performance of the agreement, and further requires them to cooperate in the defense of the claim. In *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186 (2d Cir. 2003), the Second Circuit rejected an argument similar to that advanced by Nationwide in this case. As the court explained, "[t]o extend the indemnification clause to require defendant to reimburse plaintiff for attorney[s]' fees in the breach of contract action against the defendant would render these [notice] provisions meaningless because the requirement of notice and assumption of the defense has no logical application to a suit between the parties." *Id.* at 200. Nationwide, which drafted the GSA Agreement, could have provided in the GSA Agreement that Nationwide itself drafted that either party could recover its attorneys' fees and costs in the event of a breach of the agreement. Often, commercial parties agree to such provisions. *See, e.g.*, *DEA & Assocs., LLC v. McCall*, No. CVH-7482, 2007 WL 117487, at *1 (Conn. Super. Ct. Jan. 12, 2007) ("The lease contained a provision providing that the prevailing party would recover attorneys' fees and costs of any legal action or proceeding . . . ."); *see Crest Plumbing and Heating Co. v. DiLoreto*, 531 A.2d 177, 183-84 (Conn. App. Ct. 1987) (upholding the awarding of attorney's fees under a contract provision). But here, Nationwide did not include such a clause, and the Court will not permit Nationwide to accomplish the same result through the use of an inapplicable indemnification provision.

    **B.    Atkinson Associates's Damages**. By breaching the notice and cure provisions of the GSA Agreement, Nationwide deprived Atkinson Associates of the ability to earn profits on sales

of Nationwide tickets from early February to the termination of the GSA Agreement in April. Mark Harrison, Atkinson Associates's damages expert, testified that Atkinson Associates's lost profits for this period totaled $62,408. *See also* Defs.' Ex. 532. The Court found Mr. Harrison's testimony to be credible and well-founded. In closing argument, counsel for Nationwide sought to raise a host of mathematical objections to Mr. Harrison's figure. Notably, however, counsel for Nationwide never raised these objections at trial and never gave Mr. Harrison an opportunity to address them. Accordingly, the Court credits the figure provided by Mr. Harrison. *See Leisure Resort Tech., Inc v. Trading Cove Assocs.*, 277 Conn. 21, 36 (2006) (proof of damages must be established "with reasonable certainty and not speculatively and problematically."). Since Connecticut's "case law unequivocally supports awarding lost profits as an element of compensatory damages for general breach of contract claims," *Ambrogio v. Beaver Pond Rd.*, 267 Conn. 148, 155 (2003), the Court finds that Atkinson Associates is owed $62,408 for Nationwide's breach of the termination provisions of the GSA Agreement. Thus, Nationwide will recover a net award (before interest) of $198,541.05.

   **C.      Prejudgment Interest.**      Both sides agree that under Connecticut law, they are entitled to prejudgment interest at the rate of 10% for the detention of the amounts due. *See* Conn. Gen. Stat. § 37-3a. The prejudgment interest for Nationwide will run from January 26, 2004, when Nationwide made the demand for Atkinson Associates to remit the money owed. As to interest on the breach of contract claim for Atkinson Associates, Nationwide breached the termination provisions of the GSA Agreement as of February 2, 2004, but Atkinson Associates would not have earned the lost profits that the Court has awarded for that breach until February, March, and April, 2004. Since Atkinson Associates never provided the Court with a monthly breakdown of lost profits,

the Court has chosen to commence the running of prejudgment interest on Atkinson Associates's damages from a point mid-way through the lost profits period–namely, March 10, 2004**.**

## V.    Conclusion

Accordingly, judgment shall enter as follows:

1.    For Nationwide Airlines, Inc. and against Atkinson Associates, Inc. only on the First Count of the Amended Complaint in the amount of $260,949.05, plus prejudgment interest of 10% from January 26, 2004, and for all Defendants other than Atkinson Associates, Inc. and against Nationwide Airlines, Inc. on the First Count;

2.    For all Defendants and against Nationwide Airlines, Inc. on the Second and Third Counts of the Amended Complaint;

3.    For Atkinson Associates, Inc. only and against Nationwide Airlines, Inc. on the First Counterclaim in the amount of $62,408, plus prejudgment interest of 10% from March 10, 2004, and for Nationwide Airlines, Inc. and against all Defendants other than Atkinson Associates, Inc. on the First Counterclaim;

4.    For Nationwide Airlines, Inc. and against all Defendants on the Second, Third and Fourth Counterclaims.

5.    In accordance with the agreements of the parties, the following claims are voluntarily dismissed:  (a)  The Fourth Count of the Amended Complaint for an Accounting, and all claims by Nationwide Airlines, Inc. against Mrs. Atkinson; (b)  Defendants' Sixth Counterclaim for an Accounting and Fifth Counterclaim for Defamation.

Each party will bear their own costs and fees.   **The Clerk is directed to close this file.**

IT IS SO ORDERED,


/s/    _____Mark R. Kravitz_____
United States District Judge


Dated at New Haven, Connecticut: **February 14, 2007**